The next case on the calendar is Arkansas Public Employees v. Bristol-Myers Squibb. Good morning, Your Honor, and may it please the Court, Salvatore Graziano for the Plaintiffs. On De Novo's review of this securities fraud complaint, this Court should reverse the District Court's dismissal of both falsity and a strong inference of scienter. And I first want to talk about falsity and then move on to the strong inference of scienter. In terms of falsity, there are three separate categories of facts alleged in the complaint that demonstrate Bristol-Myers and defendant's statements were false. The defendants repeatedly described the endpoint of their clinical trial as one that was focused on strong or high-positive PD-L1 expression. They chose that word for a specific reason. And the first of the three points I want to make as to why that word was false and misleading was in every trial prior to this major one, five in a row, Bristol-Myers defined 5% positivity as the mere cutoff for being positive for the trial, the baseline. Are those two propositions inconsistent? Not yet, Your Honor. Not yet. I understand that question, but the point is they switched words. So maybe what they had in mind was 5% is the same as strong, but that's not what they did. They repeatedly used 5% in five trials before this one starts. They published data since 2002 showing that 5% was the threshold for being positive or not positive. They never used the word strong up until this trial. So why the sudden change? Why use a descriptor as strong or high, which they repeatedly did? It was for one specific reason. They wanted to hide the ball. They didn't want the competition merc to know what they were up to. Okay, but just making sure I understand. So it's not, you can say that the expression, our cutoff for expression is 5%. It's not inconsistent necessarily. You want to say that it's misleading, but something could be strong expression and still be the lowest threshold at which it's expressed. Well, in their mind, that would be their defense. But publicly, industry-wide, among analysts, among competitors, no one understood at this point in time 5% could be the same as strong. 5% had been repeatedly used to be the bare threshold to even get into the study. Well, so we could talk about what the market perceived, but just linguistically, it's possible to say that 5% is strong because that means it's measurable. It's not the absolute minimum of expression, but it's measurable. And maybe you could say that that's strong expression, right? So the dictionary definition by itself wouldn't tell you that this is a misrepresentation. That is why I was agreeing with Chief Judge Livingston that I see that tension. But here, it's not just about 5% is strong because we have a history in the industry, both among Bristol-Myers and Merck, that they were using 5% as a threshold. Then they said, we are looking at high expressors, we're looking at low expressors. They used a vague term on purpose. The effect of that vagueness is very apparent. The industry thinks they're not just at 5%. The analysts, both before and after the 5%— If the term is merely vague, would that amount to misrepresentation? It can. Like if they said something like substantial or substantive or measurable expression, you know, you wouldn't say that that's a misrepresentation. That would just be a vague term. And it has to be that there was an understanding that this term meant something other than what they were using it to mean, right? Vagueness can be misleading if it is used by design. This was not an accident. This was not an oversight. This was not a misunderstanding. This was a sudden switch in terminology. It's used by design, but they're also telling the public, or the investing public at least, we're not telling you the actual thresholds, right? They say that all along. Yes, they do say that, but then they mix in there, but it is strong, it is high, and we are able to— Right, so it has to be that that is the misleading part, that that actually meant something other than the way they were using those words. And how do we know that it meant something? Because we know up until this trial, they continuously used 5% as a mere threshold, and now they switched words, and they put a label on it. They didn't say at a pre-specified cutoff, which maybe would go to what Your Honor is saying. They said a strong level. And strong meant something, because strong, the analysts equated with the likelihood of success. The analysts actually chart out, well, if it's 50%, that's a really— they put statistics on it.  If it's 10%, that's going to be a 67% chance of success. When they find out it's 5%, they're stunned. They call it the biggest surprise in their clinical career. They just never had any expectation. They put that—one analyst at Cowan & Company, in paragraph 124 of the complaint, put that at a 0.5% chance of success. You said earlier, I believe, that this was done deliberately in order to Your Honor, respectfully, I didn't say to protect a commercial secret. What they did deliberately— They were hiding the ball from Merck, which was their competitor. Right, right. And it would have been very advantageous for Merck to know that it was 5%. Because if it was effective at 5%, it would have been a bonanza. It would have been a bonanza. But what they did—and maybe this helps the Court with this word strong we've been talking over. At the end, they go back and they change the word. It's gone. They go back to the clinical trial protocol. They remove the word strong and they put the word 5%. And why the change if 5% and strong are the same? But back to Your Honor's question, they wanted— If it were an ambiguous term that they were using advisedly just to be ambiguous on the point, as long as they were letting people know that they were being ambiguous, it wouldn't be inconsistent to then be precise retroactively. Fair enough. We have trouble seeing the word strong as ambiguous. The word strong— Was it misleading when they first announced the trial, when they first put it in clinicaltrials.gov? Or did it really become misleading after Merck went out and said, we think strong is 50% and then the industry reacted to that? What's the point at which you think it's misleading? Before they first used the word strong in 2014, the history already showed that 5% was a baseline, a threshold. When the class period starts— Even if Merck had never done their trial and had never treated strong as 50% in their trial because they didn't have a trial, you still think that the industry would have been shocked to discover that strong expression was 5%? Absolutely. I think Merck is just one part of what shows this word to be misleading. I think their change of words, their admission at the end of the class period, we didn't focus on high expressors. That's why our trial failed. They changed the word from strong to 5%. They could have avoided using the word Judge Jacobs. They didn't have to say strong. They could have said it at a pre-specified endpoint that we don't want to tell you. That would have been fine. But they used a descriptor here. They used the words high and they used the word strong repeatedly. We know that the individual defendants shifting to a strong inference of Sientra in just a few— So I think you agreed that they could have advised them to use an ambiguous term like pre-selected. Now, is it possible that we look at the facts here and think that's what they intended to do with strong, but they did it in a clumsy way and so we don't find Sientra? Or is it clear that they really intended to mislead the public? I don't think you can do that on a motion to dismiss where the complaint allegations are to be accepted as true, the inferences are to be drawn in plaintiff's favor. I think there is a lot— But there has to be a strong inference of Sientra, right? So why don't you tell me why it's not possible that they were using the word strong the same way in your hypothetical they might have used the word pre-selected? Okay. I think the strongest inference is the newness of the term, the competition with Merck, the admission at the end, the individual defendants' personal involvement in setting up the trial and picking the end point. They knew what was going on. They used the words to get the leg up in the competition. I'm sorry. I see I'm out of my time. Should I finish this answer? Should I just finish this sentence? Sure. Sure. This wasn't a misunderstanding. This was a gamble. People were made to leave the company when this ended badly. That is the strongest inference you can get from looking at the whole facts together. Thank you. Your Honors, I'm Joseph Ramer. I represent the employees of the—Chris Myers and all the defendants. I want to start with C entered because I think that's clearly where the court has the most searching role here because, of course, the inference they need to establish has to be the most compelling, more compelling than an exculpatory one. It's simply not true that the complaint alleges that the last five trials that Bristol-Myers had done had all used 5%. And one can see that, for example, by looking at a chart in the complaint which shows a number of trials. I think the chart—maybe my colleague would help me with the page number, but the chart shows, I believe, eight BMS trials, and three of them use a different definition than just 5. One uses 1, 5, and 10. One uses—actually, I think 1 goes all the way up to 20. Tests are 25 and 50. All of this suggests a really basic question, which I take from your adversary's argument. I mean, if strong and weak are so vague that strong can mean weak and weak can mean strong, then what was the import of what you disclosed? What was the import of saying that it was strong? Your Honor, I don't think it's fair. We disclosed that we were going to have a series of primary endpoints, one of which was 1%, and another was strong PD-L1 expression. We wouldn't tell people how we were defining strong PD-L1 expression until we had data. When Merck announced it was using 50%, we announced we are not using 50%. We're using something lower. There's no allegation there was a stock trial. Some analysts thought it was— Well, you just said it was lower than 50%. Correct. I mean, it was dramatically lower than 50%. It was, Your Honor. That's what you were saying, too. If you say, well, it is strong, but it's lower than 50%, and if people think that strong is something above the threshold of 5%, then they might have assumed it was 40%. Your Honor, the NEPTAR slide is not the only example. There are at least four direct contradictions in the 10 articles they cite, which say there is—we don't know the best number. We don't—positivity hasn't been determined and so on. This is all mixing apples and oranges. Tests that looked at positive expression are described by them as saying near or low or something like that when they didn't. Well, it does seem like there's a range. All of their sources suggest that strong is somewhere between 10 and 50. That's not true, Your Honor. For example, there is in the record—give me one moment—a reference at 193, they quote Mr. Cuss saying, it's not clear to us that you have very high levels of PD-01 expression to benefit from treatment. If you recall the overall survival curve from the 057 trial, the shapes of the— But Cuss, that's from Bristol-Myers-Squibb, right? Yes, and in fact— All right, so he's saying we're going to do something below 50%. It's not clear to us you need very high levels, but— Similar at 1, 5, and 10% in that quote at 193 of the complaint, which is picked up at JA 1318 in a Goldman Sachs report, which looks at those very studies and says their base case is that Bristol-Myers is using 5% because of the fact that there were only incremental changes in survival in numbers that—the kind of numbers they're insisting everybody understood. And that's simply not the case. So this is on the investor call where he says the shapes of the Kaplan-Meyer curves are similar across the 1, 5, and 10% cutoffs, is that right? Correct, and if you look at JA 1318, you can see that the Goldman Sachs analyst says that's why we think the base case is 5% because that data itself points to them using 5% as a cutoff. In fact, different industry analysts speculated about what this means. It only matters if it's a defined term. And they happen to let you, before the article is expressed up to 10, expressly say, what's the effect of, there is no scheme. They're wrong in saying that there have been five in a row that used 5% by us, and they're wrong in saying that there was a great deal of trial work that talked about strong. This is very much evolving as they've conceived, and I think the 001 trial by Merck is the first one, and it's not a phase 3 trial, it's a phase 1 trial, to use that word. On that basis, they say Merck confirmed it was using 50 in the 024 trial, which is a mischaracterization. And the fact is, this is all evolving as they concede and complain to the nation of science. This isn't how trials work. If somebody succeeded at 50, defining strong as 50 for its trial, it doesn't mean that 5 won't produce a successful result. It doesn't mean that 40 find it. It's just not how science works. Well, the question isn't what's going to be a successful result. The question is the use of the language. But, Your Honor. So can I tell you this? So if we were to think that there's some evidence pointing in the direction that people understood strong to mean something much higher than 5, and some evidence that suggests otherwise, why isn't that a jury question? Because of two things. With respect to CENTER, that tie goes to us. They have to show that they've created the more compelling inference. And they simply have. It's as simple as this. When every article they cite, not only does it say there is a consensus, and by the way, I didn't choose to frame a complaint that way. They did. They filed a complaint that said 34 times there was an industry consensus for an industry understanding. Cited 10 articles. Four of them said expressly there is not. Six of them are like weather reports. They say somebody at a particular trial is defining a term this way. None of them say, just like none of the confidential sources say, that there was a universal understanding industry consensus. Again, they chose that. I hear your argument basically to be that anyone would have assumed that the disclosure you made was meaningless. Why wouldn't the most accurate disclosure, based on what you're saying, have been, we're not going to tell you, or none of your business? It was the disclosure, Your Honor. We said, we are testing 1%, and we are testing people who express strongly relative to 1%, obviously. We're not going to tell you what that cutoff is until we have data. We said that over and over again, as they concede in the complaint, when Merck said, we used 50. Before Merck had succeeded, we said, we're not using 50. We're using something lower. Again, none of this is settled. Merck is alleged to have had the first phase 3 trial testing strong expression. Not just noting something about it in comments that are preliminary or something like that, but testing strong expression that succeeded. So you're saying the word strong is in your trial because you were also testing merely positive at 1%? I'm saying it for two reasons. That's one. And the other is that the data that Mr. Cuss talked about and that Goldman looked at said, in fact, at 5% you see more of a benefit to this particular treatment, and at 10% you do. And then it's just incremental after that. And that's what he said. That's what Goldman understood. I mean, I understand you say that for various reasons the court shouldn't look at it. But how would you explain the surprise by the analysts when it was revealed that it was 5%? Your Honor, some were surprised. Alliance Bernstein had said it was 5%. I'm sure they weren't. Goldman had said it was 5% or 10% with a base case of 5%. They weren't. Markets react to failed trials. Markets react to some analysts thought it was a different number. The reality is that trials fail in this industry, unfortunately, too often. It sounds like your position is that they shouldn't have been surprised. People can, after the fact, rationalize whatever their views were of a failed trial. We never, as Your Honor said, we never said we're going to tell anybody. On the contrary, and again, this is not— But it would still be a misrepresentation, right? If strong really did mean something like 50%, the fact that you told people, well, we're not telling you exactly what it is, would not prevent that from being misleading. It has to be— Your argument has to be that strong did not mean 50%. Your Honor, it would be different if there's textbooks that said, we all know strong is 50%. If we're talking about something subtle. But these numbers have meaning in the context of the science as they allege it. To say 5 is not a high number, if I have a 0.5% blood alcohol level, I might be dead. If we had a 5% death rate from COVID, courts wouldn't be open. These numbers have to be taken in context. And to pretend this was all subtle is a complete mischaracterization. Again, they don't allege a single phase three trial testing strong as 50% before the Merck O2-4 trial, which reads out in June and two months before, month and a half before the end of the class. I mean, that's simply not a basis to allege this thing had a single meaning in everything we understood. Could you address Dr. Bloom's allegations and how we should treat them if we accept the thrust of your argument? Yes, Your Honor. Again, I think this could be taken up in the context of Sienta where the court has the broadest scope. I think there are cases that say with good reason, because the PSLRA plaintiff can't meet their factual burden, by pointing to something their expert tells them, number one. Number two, I think he makes clear that his opinions are based on what he calls the source material cited herein, the same articles that are filled with contradictions. And if I could just very quickly note, Festino, Cedrus, the Reuters article they cite, each of these things are in the record. Each of these things are directly contradicted if one compares what's said to the allegation that there is, in fact, any settled meaning. And third of all, there's nothing to link the fact he has this view to the idea that Crystal Myers was aware of that. Well, why doesn't that inform how we would understand the articles? So if, in fact, the articles, it's not totally obvious they reflect an industry consensus, why can't an expert say, well, as somebody who's in this field, if I saw all of these articles being published that talked about strong expression in these terms, I would understand that that's what strong expression meant. And why wouldn't that have probative value as to how we should understand whether the articles reflected an industry view? We don't have that case. We have one which simply says, I read articles and I think there was an industry standard. Festino says... But do you agree that if, in fact, that's the nature of his testimony, that that would be probative? I agree that plaintiffs ultimately have to plead with particularity and with regard to Sientra, that the question is, have they fled the most compelling inference? Whether in a different case it would be slightly more persuasive isn't what we have. We have a complaint, again, they chose to file. And it's not just the next article, which I want to emphasize, in a sense, is cumulative, because any comparison of the Festino, the Kerr, the Reuters article, and so on, the Sedra's article is going to show that they contradict what's said about them. Indeed, one of the more amusing parts of this is we quoted one of the articles saying that the best cutoff isn't known. And they said, well, that's best. All that article is really doing is talking about a particular trial. Exactly. It's not saying there's an industry standard. It's reporting on the weather that one party used the trial. So can I ask, if, in fact, we read the record to suggest that maybe at the outset, it wasn't clear what strong meant, but then Merck's definition of strong informed how people thought about it, would your client have an obligation to clear up the misunderstanding if people were inferring from that use of strong that you were at something like 50%? Your Honor, the complaint asserts that the first time Merck acknowledged in any way other than their, I think, wrongful reading of TV's report, that it was using 50% is in February 2016. In April of 2016, we're alleged to have did say, we are not using the Merck definition of strong. So I don't really think we have that case. And again, all that Merck would have shown is that in its trial, with its group of patients, it showed results with a cutoff of 50%. That doesn't mean there wouldn't be the same results comparing chemo and this type of drug of 45 or five or two. It simply means their trial succeeded. The fact that our trial failed means our trial failed. It doesn't mean that one couldn't have, in running a trial that had both 1% for positive expression and a higher number for strong, have used 5% and described it. So again, once they said that's what they were doing, we did that. I think I'm over my time. I'm going to support another question. Yes, ma'am. We'll hear rebuttal. Thank you, Your Honor. I want to quickly correct some of my colleague's errors. 1% was not a primary endpoint in this trial. It was just an entry point to get into the trial. The primary endpoint only focused on strong, which was the unspoken 5%. In paragraph 55 of the complaint, all five prior Bristol-Myers trials used 5% as a mere threshold. That's paragraph 55 of the complaint, the chart he was speaking of. Merck, beginning in 2014, didn't just use strong in this one comparison trial with this drug. It used it more than once repeatedly beginning in 2014, which is well before the class period starts. The defendants here keep using the word strong. They didn't just say it once in 2014. They said it repeatedly, as we have in paragraph 160 of the complaint, over and over again. They want to turn to Goldman Sachs, Alliance Bernstein. Those reports are not in the complaint. They're not mentioned in the complaint. They're not incorporated by reference in the complaint. This is not summary judgment. This is not the time for them to be reaching extraneous evidence to try to- So I understand that you're saying that we shouldn't look at it, although the defendants have an argument that we should take notice of it. But putting that aside, how would you explain that? The other analysts expected 5%. There are two. They both acknowledge that they don't know. The Tim Anderson one from Alliance Bernstein says, I think it's 5%, but everyone else thinks it's 10, and the lower you go, the more risk this trial is going to fail. So that's pretty interesting. Tim Anderson at Alliance Bernstein doesn't know, but he cautions the lower this is, the more trouble this trial is. He's saying it's risky to do a lower one, but he also seems to think that it wasn't the lower. And he says everyone else thinks he's wrong. So I don't think that is truth on the market. I don't think that is enough for them. If anything, that shows you how deceptive the word strong was. Goldman Sachs also says they don't know. They say it could be 5 or it could be 10. Again, we are well beyond complaint. If we're going to do things like that, let's have some discovery. Let's see what they were saying internally. This is not summary judgment. My colleague was wrong when he said a tie goes to them. Justice Ginsburg said in Telabs, a tie goes to the plaintiffs in the strong and Prince of Siendra analysis. If this is a tie, we win, not them. Their words mattered. You can see in the complaint in the analysts that are quoted in the complaint how deceptive their words were. They didn't have to use that word. They did it to fool Merck, but unfortunately, they also fooled the market. And the analysts were shocked when the truth came out. And they tied it directly to the failed results of this trial because these drugs were really comparable. The company then agrees and says, we picked the wrong endpoint. It wasn't high. And they changed their word strong to 5%, to be honest. So that's what this case is really about. I think we should have a fair chance to go back to the district court and get some discovery to see what was really going on within the company if we're going to start looking at Goldman Sachs and Allianz Bernstein. Thank you, Your Honor. Your Honor, could I just get a page number? You want to provide a page number? I just want to provide that I was at a loss for a page site for the chart I mentioned. It's FJA873, paragraph 55 of the second amended complaint. Thank you both. And we will take the matter under advisement. Nicely done. That's the last case to be argued this morning. So I'll ask the court to adjourn court. The court stands adjourned.